MORRISDALE COAL CO. v. PENNSYLVANIA R. CO.

(Circuit Court, E. D. Pennsylvania. February 5, 1910.)

No. 102.

CARRIERS (§ 36*) — DISCRIMINATION — DISTRIBUTION OF CARS—PAST ACTS—ACTIONS FOR DAMAGES—INTERSTATE COMMERCE COMMISSION—COURTS—JURISDICTION.

Where an alleged unlawful discrimination in the distribution of coal cars in violation of Interstate Commerce Act (Act Feb. 4, 1887, c. 104, § 3, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155]) had been practiced by defendant railroad company, resulting in injury to plaintiff, for which it was entitled to damages, such discrimination having been applicable to a class of shippers and not to complainant alone, the Interstate Commerce Commission had exclusive original jurisdiction to afford complainant relief, it not being entitled to sue in the first instance in an action for alleged damages sustained thereby, authorized by section 9, and this, though the acts constituting the alleged discrimination had ceased prior to the commencement of the suit.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 95; Dec. Dig. § 36.*

Duties and liabilities of carriers as to furnishing facilities for transportation, see note to Harp v. Choctaw, O. & G. R. Co., 61 C. C. A. 414.]

Action by the Morrisdale Coal Company against the Pennsylvania Railroad Company to recover damages for alleged discrimination in the distribution of coal cars in violation of the interstate commerce act. On motion to dismiss for want of jurisdiction. Granted.

Chester N. Farr, Jr., and Wm. A. Glasgow, Jr., for plaintiff.
Francis I. Gowen and John G. Johnson, for defendant.

J. B. McPHERSON, District Judge. This suit was brought to recover damages from the Pennsylvania Railroad Company for a practice that is alleged to be in violation of the act to regulate commerce. Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]. The plaintiff's coal mine is in the Clearfield region of this state, and the defendant carries much of the product in commerce between the states. The practice complained of was a method of distributing coal cars among the mines of the region at times when the supply of cars fell short. The plaintiff averred that an undue preference was given thereby to other miners and shippers in the same region, while it was obliged to bear an unreasonable burden. This being forbidden by section 3, the plaintiff sued to enforce the liability referred to in section 8, and claims the right to recover, in spite of the conceded fact that no complaint was made in the first instance to the Interstate Commerce Commission. The suit is said to be brought under the permission given by section 9, a trial was had before a jury, and a special verdict was rendered in favor of the plaintiff. The right to judgment, however, was still undetermined when the present motion was made; and this right was believed at the trial to depend upon the decision of certain questions that are referred to in the verdict. Among these, it was a vital question whether the method that was followed by the railroad company during the years 1902–1905 for distributing its available supply of cars during periods of shortage imposed unreasonable disadvantage upon the plaintiff, or gave unreasonable preference to its competitors in the Clearfield region. Briefly, the method was this: The railroad company determined the capacity of the various mines in the region by a computation that is not complained of, and thus arrived at the proportion of cars to which the plaintiff and other miners would be entitled when cars were too few to meet the demand completely. This proportion was applied to the deficient car supply in the following manner: Each day the total number of cars available for the whole region was ascertained by the railroad company, and a distribution sheet was then made up, allotting to the plaintiff and the other miners the cars to which the defendant's method of distribution showed them to be entitled. The total available cars consisted of four classes: Those that belonged to private individuals or corporations; those that were to be filled with coal that the railroad company had bought for its own use as fuel; those that belonged to foreign railroad companies, and were also to be filled with coal that these companies had bought for their own use as fuel; and system, or company, cars—meaning such cars as did not belong to either of the first three classes but were available generally for the carriage of coal. If the railroad company had distributed the total number of these four classes ratably among the mines according to capacity, the plaintiff would not be now complaining. But a different method was pursued. From the total number of available cars the defendant deducted the aggregate of the first three classes—assigning the private cars to the individuals or corporations who owned them or were entitled to use them, and assigning its own fuel cars and the fuel cars of foreign railroads to the mines from which the supply was to come—

and distributed the fourth class alone in proportion to capacity. The result was that the owners or users of private cars received these cars, and also their ratable proportion of the fourth class; and the miners who had contracted to fill the fuel cars, either of the defendant or of foreign railroad companies, received these cars, and also their ratable proportion of the fourth class; while the plaintiff received only its ratable proportion of the fourth class, and was thus confined to a supply that was necessarily smaller than if its proportion had been allotted out of the total of the four classes. Averring injury by this method of distribution, and asserting that the total number of the four classes without any deduction should have been divided among the mines of the region in proportion to their ascertained capacity, the plaintiff sought to recover damages in this action for unlawful discrimination.

It will at once be observed that the suit requires a court and jury to decide whether the defendant's method of distribution offended against the act. The questions are (1) whether this method gave a preference to any particular person, company, firm, or corporation, or subjected the plaintiff to any prejudice or disadvantage; and (2) if such preference or disadvantage existed, whether it was undue or unreasonable. These are questions of fact, and manifestly cannot be decided merely by considering what methods may have been held to be lawful, when adopted and applied by other railroads under other circumstances. There is no "rule of law" that requires the aggregate of available cars always and everywhere to be divided ratably in times of shortage. Even if it be conceded that, whenever a dispute upon the subject has been presented to a court or to the Commission, this method of distribution has usually been decided to be the fairest, it does not follow necessarily that the method is to be applied in the next dispute that arises. It is perhaps more nearly correct to speak of the "rule" as similar to a working hypothesis. It may do to start with, if—or since—it represents a fairly general opinion concerning what is just and equitable; but the circumstances of a given case may require the rule to be modified, and would certainly require it to be modified, if, instead of avoiding, it would cause, an undue preference or disadvantage. What is undue or unreasonable is ordinarily a pure question of fact; and, where such a question is presented, it is necessary to be cautious in applying a rule that may have been properly used to decide a similar question, but under different circumstances. And, since the question is of fact, there will always be the danger that different courts and juries may reach different conclusions, even when the evidence and the facts are essentially the same. Different minds occupy different points of view, and may therefore see the same question from opposite angles with varying results. Moreover, as a question of fact can only be resolved by evidence, it may easily happen that the quantity or quality of evidence may differ in one trial from another, so that recovery by one plaintiff and failure by another may both be just—one having evidence enough, while the other has too little, to support a verdict.

These remarks may perhaps serve as a preface to the examination of two or three recent decisions of the Supreme Court, which deal

with some of the difficulties that beset the effort to apply section 3 by the piecemeal procedure of unconnected trials before a court and jury. Facing these difficulties, and influenced no doubt by other considerations as well, the court has, I think, announced important conclusions upon the construction of the act; and it is therefore necessary to examine carefully the decisions referred to, and to note the course of reasoning by which they have been reached. The first is Texas & Pacific Railway Company v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553. This has to do with an unreasonable rate, but much that is said by the court is also applicable to a dispute like this, where the injury is charged to an unreasonable practice. The oil company was compelled to pay a rate which it believed to be more than was reasonable, and the suit was brought to recover the excess. The action was at common law in a court of the state, and the railway defended, inter alia, by averring, and afterwards proving, that the shipment was interstate, and that the rate complained of had been established and posted as required by the act to regulate commerce. Nevertheless, the Texas Court of Civil Appeals decided that, as the rate had been found by the trial court to be unreasonable, the oil company had a right to recover under the principles of the common law, although the rate had been established by the carrier under the federal statute. In other words, the state court entertained a suit, the purpose of which was to pronounce a rate unreasonable, in spite of the fact that the rate had been established and posted under the provisions of the act, and in spite, also, of the fact that the reasonableness of the rate had not been passed upon by the Commission. A question was thus presented which the Supreme Court states in the following language (page 436 of 204 U. S., page 353 of 27 Sup. Ct. [51 L. Ed. 553]):

The fundamental question is "the scope and effect of the act to regulate commerce upon the right of a shipper to maintain an action at law against a common carrier to recover damages because of the exaction of an alleged unreasonable rate, although the rate collected and complained of was the rate stated in the schedule filed with the Interstate Commerce Commission and published according to the requirements of the act to regulate commerce, and which it was the duty of the carrier, under the law, to enforce as against shippers."

The court conceded that a shipper might recover damages at common law if the carrier charged an unreasonable rate, and that such damages might properly be measured by the excess above a proper rate. And it is further conceded that the oil company was clearly suing upon a right that was valid at common law, and that the act to regulate commerce had not expressly taken the right away. But it was held that the right was nevertheless taken away impliedly, although the court agreed that repeals by implication are not favored, and that a statute should not be construed to take away a common-law right unless such a result is imperatively required. This ruling in favor of the implied repeal is supported by showing that the act provides complete machinery for the protection of shippers, and has substituted its own remedies for the remedies of the common law. To sustain this position, the court summarizes the statute as follows:

"The act made it the duty of carriers subject to its provisions to charge only just and reasonable rates. To that end the duty was imposed of establishing and publishing schedules of such rates. It forbade all unjust preferences and discriminations, made it unlawful to depart from the rates in the established schedules until the same were changed as authorized by the act, and such departure was made an offense punishable by fine or imprisonment, or both, and the prohibitions of the act and the punishments which it imposed were directed not only against carriers, but against shippers, or any persons who, directly or indirectly, by any machination or device, in any manner whatever, accomplished the result of producing the wrongful discriminations or preferences which the act forbade. It was made the duty of carriers subject to the act to file with the Interstate Commerce Commission created by that act copies of established schedules, and power was conferred upon that body to provide as to the form of the schedules, and penalties were imposed for not establishing and filing the required schedules. The Commission was endowed with plenary administrative power to supervise the conduct of carriers, to investigate their affairs, their accounts, and their methods of dealing, and generally to enforce the provisions of the act. To that end it was made the duty of the district attorneys of the United States, under the direction of the Attorney General, to prosecute proceedings commenced by the Commission to enforce compliance with the act. The act specially provided that whenever any common carrier subject to its provisions 'shall do, cause to be done, or permit to be done, any act, matter or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter or thing in this act required to be done, such common carrier shall be liable to the person or persons thereby injured for the full amount of damages sustained in consequence of any such violation of the provisions of this act. * * *' Power was conferred upon the Commission to hear complaints concerning violations of the act, to investigate the same, and, if the complaints were well founded, to direct, not only the making of reparation to the injured persons, but to order the carrier to desist from such violation in the future. In the event of the failure of a carrier to obey the order of the Commission, that body, or the party in whose favor an award of reparation was made, was empowered to compel compliance by invoking the authority of the courts of the United States in the manner pointed out in the statute, prima facie effect in such courts being given to the findings of fact made by the Commission."

Pointing out that the act was undoubtedly intended to redress the wrongs resulting from unjust discrimination and undue preference in regard to rates, and that this object was to be accomplished by compelling the carrier to establish schedules of reasonable rates that should apply uniformly to all, and should not be departed from until the schedule was changed in the manner provided by the act, the court goes on to say:

"When the general scope of the act is enlightened by the considerations just stated it becomes manifest that there is not only a relation, but an indissoluble unity, between the provision for the establishment and maintenance of rates until corrected in accordance with the statute, and the prohibitions against preferences and discrimination. This follows, because, unless the requirement of a uniform standard of rates be complied with, it would result that violations of the statute as to preferences and discrimination would inevitably follow. This is clearly so, for if it be that the standard of rates fixed in the mode provided by the statute could be treated on the complaint of a shipper by a court and jury as unreasonable, without reference to prior action by the Commission, finding the established rate to be unreasonable, and ordering the carrier to desist in the future from violating the act, it would come to pass that a shipper might obtain relief upon the basis that the established rate was unreasonable, in the opinion of a court and jury, and thus such shipper would receive a preference or discrimination not enjoyed by those against whom the schedule of rates was continued to be enforced. This can only be met by the suggestion that the judgment of a court, when based upon a complaint made by a shipper without previous action by the Commission, would

give rise to a change of the schedule rate, and thus cause the new rate resulting from the action of the court to be applicable in future as to all. This suggestion, however, is manifestly without merit, and only serves to illustrate the absolute destruction of the act and the remedial provisions which it created, which would arise from a recognition of the right asserted. For if, without previous action by the Commission, power might be exerted by courts and juries generally to determine the reasonableness of an established rate, it would follow that, unless all courts reached an identical conclusion, a uniform standard of rates in the future would be impossible, as the standard would fluctuate and vary, dependent upon the divergent conclusions reached as to reasonableness by the various courts called upon to consider the subject as an original question. Indeed, the recognition of such a right is wholly inconsistent with the administrative power conferred upon the Commission, and with the duty which the statute casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed. Equally obvious is it that the existence of such a power in the courts, independent of prior action by the Commission, would lead to favoritism, to the enforcement of one rate in one jurisdiction and a different one in another, would destroy the prohibitions against preferences and discriminations and afford, moreover, a ready means by which, through collusive proceedings, the wrongs which the statute was intended to remedy could be successfully inflicted. Indeed, no reason can be perceived for the enactment of the provision endowing the administrative tribunal which the act created with power, on due proof, not only to reward reparation to a particular shipper, but to command the carrier to desist from violation of the act in the future, thus compelling the alteration of the old or the filing of a new schedule, conformably to the action of the Commission, if the power was left in the courts to grant relief on complaint of any shipper, upon the theory that the established rate could be disregarded and be treated as unreasonable, without reference to previous action by the Commission in the premises. This must be, because, if the power existed in both courts and the Commission to originally hear complaints on this subject, there might be a divergence between the action of the Commission and the decision of a court. In other words, the established schedule might be found reasonable by the Commission in the first instance and unreasonable by a court acting originally, and thus a conflict would arise which would render the enforcement of the act impossible."

But, as the argument had been made that section 9 permits an injured shipper either to complain to the Commission, or to sue at law. merely compelling him to elect which remedy he will adopt, and that the suit under review had been brought in the exercise of such election, the court replied to this contention in the following significant language:

"Nor is there merit in the contention that section 9 of the act compels to the conclusion that it was the purpose of Congress to confer power upon courts primarily to relieve from the duty of enforcing the established rate by finding that the same as to a particular person or corporation was so unreasonable as to justify an award of damages. True it is that the general terms of the section, when taken alone, might sanction such a conclusion, but, when the provision of that section is read in connection with the context of the act, and in the light of the considerations which we have enumerated, we think the broad construction contended for is not admissible. And this becomes particularly cogent when it is observed that the power of the courts to award damages to those claiming to have been injured, as provided in the section, contemplates only a decree in favor of the individual complainant, redressing the particular wrong asserted to have been done, and does not embrace the power to direct the carrier to abstain in the future from similar violations of the act; in other words, to command a correction of the established schedules, which power, as we have shown, is conferred by the act upon the Commission in express terms. In other words, we think that it inevitably follows from the context of the act that the independent right of an individual originally to maintain actions in courts to obtain pecuniary redress for violations of the

act, conferred by the ninth section, must be confined to redress of such wrongs as can, consistently with the context of the act, be redressed by courts without previous action by the Commission, and therefore does not imply the power in a court to primarily hear complaints concerning wrongs of the character of the one here complained of. Although an established schedule of rates may have been altered by a carrier voluntarily, or as the result of the enforcement of an order of the Commission to desist from violating the law, rendered in accordance with the provisions of the statute, it may not be doubted that the power of the Commission would nevertheless extend to hearing legal complaints of, and awarding reparation to, individuals for wrongs unlawfully suffered from the application of the unreasonable schedule during the period when such schedule was in force."

Several decisions are then reviewed, especially Railway v. Hefley, 158 U. S. 98, 15 Sup. Ct. 802, 39 L. Ed. 910, and Railway v. Mugg, 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011, and the court continues (page 445 of 204 U. S., page 357 of 27 Sup. Ct. [51 L. Ed. 553]):

"In view of the binding effect of the established rates upon both the carrier and shipper, as expounded by the two decisions of this court just referred to, the contention now made, if adopted, would necessitate the holding that a cause of action in favor of a shipper arose from the failure of the carrier to make an agreement"—that is, as I understand it, an agreement to charge a rate different from the rate contained in its published schedule—"when, if the agreement had been made, both the carrier and the shipper would have been guilty of a criminal offense and the agreement would have been so absolutely void as to be impossible of enforcement. Nor is there force in the suggestion that a like dilemma arises from the recognition of power in the Commission to award reparation in favor of an individual because of a finding by that body that a rate in an established schedule was unreasonable. As we have shown, there is a wide distinction between the two cases. When the Commission is called upon, on the complaint of an individual, to consider the reasonableness of an established rate, its power is invoked not merely to authorize a departure from such rate in favor of the complainant alone, but to exert the authority conferred upon it by the act, if the complaint is found to be just, to compel the establishment of a new schedule of rates applicable to all. And like reasoning would be applicable to the granting of reparation to an individual after the establishment of a new schedule because of a wrong endured during the period when the unreasonable schedule was enforced by the carrier and before its change and the establishment of a new one. In other words, the difference between the two is that which, on the one hand, would arise from destroying the uniformity of rates which it was the object of the statute to secure, and, on the other, from enforcing that equality which the statute commands."

It is then declared that section 22, which preserves the "remedies now existing at common law or by statute," cannot in reason be construed as preserving to a shipper a common-law right which would be absolutely inconsistent with the statute:

"In other words, the act cannot be held to destroy itself. The clause is concerned alone with rights recognized in or duties imposed by the act, and the manifest purpose of the provision in question was to make plain the intention that any specific remedy given by the act should be regarded as cumulative, when other appropriate common-law or statutory remedies existed for the redress of the particular grievance or wrong dealt with in the act."

And the conclusion of the whole matter is thus stated on page 448 of 204 U. S., on page 358 of 27 Sup. Ct. (51 L. Ed. 553):

" * * * A shipper seeking reparation predicated upon the unreasonableness of the established rate must, under the act to regulate commerce, primarily invoke redress through the Interstate Commerce Commission, which body alone is vested with power originally to entertain proceedings for the altera-

tion of an established schedule because the rates fixed therein are unreasonable. * * *"

This decision deals specifically with the subject of rates, but Baltimore & Ohio Railroad Company v. United States ex rel. Pitcairn Coal Co., 30 Sup. Ct. 164, 54 L. Ed. ——, has to do with the subject now in hand—the distribution of coal cars in time of shortage. The decision was rendered on January 10, 1910, and the opinion is written by Mr. Justice White, who also spoke for the court in the case of the Abilene Oil Company. The suit was begun in the United States Circuit Court for the District of Maryland by a petition for a mandamus. The writ was asked for by the Pitcairn Coal Company (apparently joined afterwards by other petitioners), in order to compel the Baltimore & Ohio Railroad Company to change its method of distributing coal cars among certain mines that were served by the railroad. It is unnecessary to describe the method in detail. It differed in several particulars from the method now complained of, but it was alleged to produce a similar effect, namely, an undue preference in favor of certain miners and shippers, and an undue discrimination against others. The railroad company denied the averments of preference and discrimination, and asserted the validity of its method and rules of distribution. The issue thus formed required an elaborate and prolonged inquiry into the facts, and in the end the circuit court made an order sustaining the railroad's method except in one particular—the company was decided to be wrong in deducting private cars before the pro rata distribution was made. The Court of Appeals went further and decided that the railroad company's method was also wrong in several other particulars, inter alia, in deducting its own fuel cars and the fuel cars of foreign railroads before making pro rata distribution to the mines in the district. The grievance of the Pitcairn Company had not been laid before the Commission, and the situation presented to the Supreme Court by all these facts is referred to in the following paragraphs from the opinion:

"One of the assignments of error assails the correctness of the conclusion of the court below to the effect that, compatibly with the act to regulate commerce, there was power under the circumstances disclosed by the record to consider the subject-matters which were complained of, and to award the relief concerning them which was prayed. Indeed, the nature of the controversy and the relief which it requires is such that, even without the assigned error to which we have referred, the question at the very threshold necessarily arises and commands our attention as to whether there was power in the courts, under the circumstances disclosed by the record, to grant the relief prayed consistently with the provisions of the act to regulate commerce, and to that subject we therefore at once come.

"To a consideration of this question it is essential to at once summarily and accurately fix the subject-matter of the alleged grievances and the precise character of the relief required in order to remedy the evils complained of upon the assumption of their existence. As to the first, it is patent that the grievances involve acts of the Baltimore & Ohio Railroad, regulations adopted by that company and alleged dealings by the other corporations, all of which, it is asserted, concern interstate commerce, and all of which, it is alleged, are in direct violation of the duty imposed upon the railroad company by the provisions of the act to regulate commerce. As to the second, in view of the nature and character of the acts assailed, of the prayer for relief which we have previously excerpted and of the relief which the court below directed to be awarded, it is equally clear that a prohibition, by way of mandamus, against

the act is sought and an order, by way of mandamus, was invoked, and was allowed which must operate, by judicial decree, upon all the numerous parties and various interests as a rule or regulation as to the matters complained of for the conduct of interstate commerce in the future."  ·

This being the situation and these being the questions, the court goes on to say:

"When the situation is thus defined, we see no escape from the conclusion that the grievances complained of were primarily within the administrative competency of the Interstate Commerce Commission, and not subject to be judicially enforced, at least until that body,· clothed by the statute with authority on the subject, had been afforded, by a complaint made to it, the opportunity to exert its administrative functions."

The court declares that the controversy is controlled by the considerations that governed the decision in the case of the Abilene Oil Company; and points out that the relief there prayed for was denied because it was inconsistent with the act to regulate commerce; the inconsistency being found in the fact that the act made the rate then in controversy of controlling force until it should be pronounced unreasonable by the Commission itself, on a complaint made to that body. Therefore the rate could not be declared unreasonable, either directly or inferentially, in a proceeding before another tribunal. Any other view would give rise to inextricable confusion, would create unjust preferences and undue discriminations, would frustrate the purposes of the act, and in effect cause the act to destroy itself.

But the Baltimore & Ohio Company Case arose in January, 1907, after the amendments of 1906 had been passed, and the court therefore proceeds to the consideration of these amendments, saying:·

"The ruling there made (in the Abilene Case) dealt with the provisions of the act as they existed prior to the amendments adopted in 1906, and when those amendments are considered they render, if possible, more· imperative the construction given to the act by that ruling; since, by section 15, as enacted by the amendment of June 29. 1906 [34 Stat. 589, c. 104, § 4 (U. S. Comp. St. Supp. 1909, p. 1158)], the Commission is empowered, indeed, it is made its duty, in disposing of a complaint, not only to determine the legality of the practice alleged to give rise to an unjust preference or undue discrimination, and to forbid the same, but, moreover, to direct the practice to be followed as to such subject for a future period, not exceeding two years, with power in the Commission, if it finds reason to do so, to suspend, modify, or set aside the same, the order, however, to become operative without judicial action. In considering section 15 in the case of Illinois Central Railroad Co. v.· Interstate Commerce Commission (just decided) [C. C., 173 Fed. 930], it was pointed out that the effect of the section was to cause it to come to pass that courts, in determining·whether an order of the Commission should be suspended or enjoined, were without power to invade the administrative functions vested in the Commission, and therefore could not set aside an order duly· made on a mere exercise of judgment as to its wisdom or expediency. Under these circumstances it is apparent, as we have said, that these amendments add to the cogency of the reasoning which led to the conclusion in the Abilene Case, that the primary interference of the courts with the administrative functions fo the Commission was wholly incompatible with the act to regulate commerce. This result is easily illustrated. A particular regulation of a carrier in interstate commerce is assailed in the courts as unjustly preferential and discriminatory. Upon the facts found the complaint is· declared to be well founded. The administrative powers of the Commission are invoked concerning a regulation of like character upon a similar complaint. The Commission finds from the evidence before it, that the regulation is not unjustly discriminatory. Which would prevail? If both, then discrimination

and preference would result from the very prevalence of the two methods of procedure. If, on the contrary, the Commission was bound to follow the previous action of the courts, then it is apparent that its power to perform its administrative functions would be curtailed, if not destroyed. On the other hand, if the action of the Commission was to prevail, then the function exercised by the court would not have been judicial in character, since its final conclusion would be susceptible of being set aside by the action of a mere administrative body."

Illustrations of actual confusion growing out of rulings by the courts and rulings by the Commission upon the same subject are then given, and the opinion passes on to consider the effect of section 10 of Act March 2, 1889, c. 382, 25 Stat. 855 (U. S. Comp. St. 1901, p. 3172), which provides for the remedy by mandamus. This is the section that had been invoked by the Pitcairn Company, and at first blush its language certainly seems to give the courts primary jurisdiction to issue the writ whenever a carrier violates the act by preferential rates or practices. But the Supreme Court declared that the apparent scope of the section must obviously be restricted so that it may harmonize with the rest of the act and not destroy one of its main purposes. Thus restricted, it does not give the remedy by mandamus primarily, but only (when the remedy is available at all) after the Commission has acted upon the complaint. To use the court's own language:

"As it was settled in the Abilene Case that the right to question in the courts the rates established in accordance with the act to regulate commerce, without previous resort by complaint to the Commission in order to determine their unreasonableness, would be destructive of the act, and therefore was not permissible, that ruling is equally applicable to the provision as to furnishing cars contained in section 10, which is here relied upon. But as we are required, for the determination of the case now before us, to consider the scope of the act to regulate commerce as now existing, as a result of the amendments of 1906, we shall not rest our conclusion alone upon the persuasive force of the reasoning which constrained to the conclusion announced in the Abilene Case. Speaking generally, it is true to say that, prior to 1889, although the prohibitions of the act to regulate commerce as to preferences and discriminations were far-reaching, the mechanism provided by the statute for the enforcement of orders of the Commission on the subject, as well as those concerning a finding as to unreasonable rates, were deemed to be in many respects ineffective, or at least tardy in operation or unsatisfactory in prompt remedial results, and this because immediate effect was not given to the orders of the Commission, but the aid of judicial authority was required as a prerequisite for such result. Section 10, here relied upon, was not part of the original act, but, as we have said, was added thereto on March 2, 1889, for the obvious purpose of making the remedial processes of the act more speedy and efficacious. Now, it cannot in reason be questioned that among the purposes contemplated by the amendments adopted in 1906 was the curing of the presumed remedial inefficiency of the act by supplying efficient means for giving effect to the orders of the Commission made in the exertion of the authority conferred upon that body. To that end one of the amendments—section 15—gives operative effect to the orders of the Commission without the sanction of previous judicial authority, and endows that body with the power, not only as to unreasonable rates, but as to practices found upon complaint to be unduly prejudicial and unjustly discriminatory, to correct the same by its order, which order should have effect within the period fixed in the statute, and, to enforce these provisions, penalties and forfeitures are provided. Section 16. It being demonstrable, as we have seen, that to give to section 10 the broad meaning which the court below affixed to it would be to destroy or render inefficacious the remedial purposes of the amendments enacted in 1906, it must follow that such construction cannot be adopted, since to do so

would compel us to hold that the wide and far-reaching remedies created by the amendments of 1906 were, in effect, destroyed by the narrower remedial processes which had been previously enacted in 1889. This conclusion being in reason impossible, it must follow that, construing the provisions of section 10 in the light of and in harmony with the amendments adopted in 1906, the remedy afforded by that section, in the cases which it embraces, must be limited either to the performance of duties which are so plain and so independent of previous administrative action of the Commission as not to require a prerequisite exertion of power by that body, or to compelling the performance of duties which plainly arise from the obligatory force which the statute attaches to orders of the Commission, rendered within the lawful scope of its authority, until such orders are set aside by the Commission or enjoined by the courts." ·

And the rulings in the Baltimore & Ohio Company Case are emphasized by another decision that was announced on the same day in an opinion written by the same justice—Illinois Central Railroad Co. v. Interstate Commerce Commission. In that case a miner and shipper of coal complained to the Commission that the railroad's method of distributing cars when the supply was short resulted in preference and discrimination—especially because the company deducted private cars and foreign railway fuel cars before making distribution to the mines along its road. The Commission was asked by the company to consider in the same proceeding the further question whether its own fuel cars might be deducted before distribution was made, and accordingly the Commission dealt with all of these three classes. Its order directed the company to give up the practice of deducting any of these classes before making distribution, and (in the exercise of the power given by the amendments of 1906) directed the carrier to include all the available cars in a total for ratable distribution, and to include them for a period of two years. The railroad company sought to enjoin the order, and the case was heard by three circuit judges of the Seventh circuit. They decided (173 Fed. 930) that the Commission was right in directing the company to include private cars and foreign railway fuel cars in the total that were to be distributed ratably to the mines, but was wrong in directing it to include its own fuel cars in that number. The Commission appealed, and the Supreme Court sustained the appeal, deciding that the circuit court should not have interfered with the order, so far as the company's own fuel cars were concerned. (The railroad did not appeal, and the other two classes of cars were therefore not specifically considered.) The point that should now be observed is this: The Supreme Court distinctly puts the decision upon the single ground that the Commission had power to make the order in question; and refuses to rest it in any degree upon the ground that the order was either wise or expedient. This appears clearly in the following paragraphs:

"In consequence of one of the comprehensive amendments to the act to regulate commerce, adopted in 1906 (section 4, Act June 29, 1906, 34 Stat. 589) it is now provided that 'all orders of the Commission, except orders for the payment of money, shall take effect within such reasonable time, not less than thirty days, and shall continue in force for such period of time not exceeding two years, as shall be prescribed in the order of the Commission, unless the same shall be suspended or set aside by a court of competent jurisdiction.' The statute endowing the Commission with large administrative functions, and generally giving effect to its orders concerning complaints before it with-

out exacting that they be previously submitted to judicial authority for sanction, it becomes necessary to determine the extent of the powers which courts may exert on the subject.

"Beyond controversy, in determining whether an order of the Commission shall be suspended or set aside, we must consider (a) all relevant questions of constitutional power or right; (b) all pertinent questions as to whether the administrative order is within the scope of the delegated authority under which it purports to have been made; and (c) a proposition which we state independently, although in its essence it may be contained in the previous one, viz., whether, even although the order be in form within the delegated power, nevertheless it must be treated as not embraced therein, because the exertion of authority which is questioned has been manifested in such an unreasonable manner as to cause it, in truth, to be within the elementary rule that the substance, and not the shadow, determines the validity of the exercise of the power. Postal Telegraph Company v. Adams, 155 U. S. 688, 698 [15 Sup. Ct. 268, 360, 39 L. Ed. 311]. Plain as it is that the powers just stated are of the essence of judicial authority, and which, therefore, may not be curtailed, and whose discharge may not be by us in a proper case avoided, it is equally plain that such perennial powers lend no support whatever to the proposition that we may, under the guise of exerting judicial power, usurp merely administrative functions by setting aside a lawful administrative order under our conception as to whether the administrative power has been wisely exercised.

"Power to make the order and not the mere expediency or wisdom of having made it, is the question."

The court thereupon considered and sustained two propositions: (1) The act gave the Commission authority to regulate the distribution of company fuel cars in times of shortage as a means of preventing undue preference or undue discrimination; and (2) the order complained of was within the authority thus given. But the expediency of the order was not passed upon at all, the court saying, inter alia:

"The insistence that the necessary effect of an order, compelling the counting of company fuel cars in fixing, in case of shortage, the share of cars a mine from which coal has been purchased will be entitled to, will be to bring about a discrimination against the mine from which the company buys its coal and a preference in favor of other mines, but inveighs against the expediency of the order. And this is true, also, of a statement in another form of the same proposition—that is, that if, when coal is bought from a mine by a railroad, the road is compelled to count the cars in which the coal is moved in case of car shortage, a preference will result in favor of the mine selling coal and making delivery thereof at the tipple of the mine to a person who is able to consume it without the necessity of transporting it by rail. At best, these arguments but suggest the complexity of the subject, and the difficulty involved in making any order which may not be amenable to the criticism that it leads to or may beget some inequality. Indeed, the arguments just stated, and others of a like character which we do not deem it essential to specially refer to, but assail the wisdom of Congress in conferring upon the Commission the power which has been lodged in that body to consider complaints as to violation of the statute and to correct them if found to exist, attack as crude or inexpedient the action of the Commission in performance of the administrative functions vested in it, and upon such assumption invoke the exercise of unwarranted judicial power to correct the assumed evils."

If this decision be read, as it must be read, in connection with the case of the Baltimore & Ohio Railroad Company and with the Texas & Pacific Railway Company v. Abilene Oil Company, the conclusion seems to be unavoidable that complaints of unreasonable rates and of unreasonable practices (at least when such rates and practices are gen-

eral, and apply to whole classes of shippers) must alike be heard in the first instance by the Commission; and that the courts have no power to entertain such complaints until the Commission's order thereon is brought before them for appropriate action. And when such an order is finally brought before a judicial tribunal, the inquiry whether the order should be suspended or set aside must be limited to considering—

"(a) all relevant questions of constitutional power or right; (b) all pertinent questions as to whether the administrative order is within the scope of the delegated authority under which it purports to have been made; and (c) * * * whether, even although the order be in form within the delegated power, nevertheless it must be treated as not embraced therein, because the exertion of authority which is questioned has been manifested in such an unreasonable manner as to cause it, in truth, to be within the elementary rule that the substance, and not the shadow, determines the validity of the exercise of the power."

The inquiry is not to be answered by deciding that in the judgment of the court the order is, or is not, either wise or expedient; if the act to regulate commerce has given the Commission power to deal with the subject, and if the order complained of is within the power, the action of the Commission is to stand.

But the foregoing cases were all concerned with rates or practices that existed when the proceedings were begun, while it is conceded that the present defendant changed the method in controversy on or about January 1, 1906, more than a year before the suit was brought. The action, therefore, being solely for damages, and for damages growing out of a practice that has ceased, the plaintiff insists that the decisions of the Supreme Court do not apply, and that section 9 of the act gives the right to sue in the courts at the election of the injured party. Evidently, this, also, is a question of great importance, and the judgment of this court is not likely to have much effect upon its solution. It can only be determined satisfactorily by the Supreme Court, and I should not feel that I were evading my duty if I merely entered a judgment and speeded the cause on its way to an ultimate decision. But I may perhaps indicate very briefly why I think that the reasoning of these cases leads to the conclusion that the circuit court does not possess primary jurisdiction of the present case.

It can no longer be doubted, as a general proposition, that the Commission is charged primarily with the jurisdiction and the duty to examine rates and practices, and to determine whether they conform to the act. And it is probably safe to say, also, that because of the diversity of situations and circumstances that inevitably affect rates and practices the Commission is likely to find it impossible to lay down general rules that will apply without modification to every possible dispute in a given class. Hence—to speak now only of the question in hand—the lawfulness of the defendant's practice during 1902 to 1905 must be determined by considering the situation and the circumstances that prevailed in the Clearfield region during the years in question. The situation being thus considered, if the practice was preferential or discriminating it violated the act. But what tribunal is to decide whether an offense has been committed? Clearly, if the practice were now in force; the Commission; and it is I think con-

ceded that the Commission might then not only forbid the practice in the future, but might award reparation for the injury done in the past. The basis of both these orders, however, would necessarily be a finding of fact—that the practice was preferential or discriminating—and this is an administrative finding which the Commission alone seems to have the power to make in the first instance. The right to inquire into this subject has not been confided primarily to the courts, and such power of reviewing the Commission's order as the courts may possess does not extend to its wisdom or discretion.

Since, therefore, the Commission alone has the power to decide primarily whether a particular method of distributing coal cars in case of shortage is preferential, I do not believe that the power is automatically transferred to the courts as soon as the carrier substitutes another method, and merely for the reason that the substitution has been made. The procedure of submitting the question of discrimination to different courts and juries has been authoritatively declared to be objectionable; but if it must nevertheless be followed in every case where the damages claimed were caused by a practice that has been changed, the uncertainty of results to which the Supreme Court has referred will bring about the very discrimination which the act seeks to avoid. If one injured shipper recovers a verdict and another fails, or if one recovers a sum calculated according to a particular rule, and the sum awarded to his neighbor is calculated according to a different rule, an obvious discrimination among the claimants must result, for the theory of all the verdicts must be that the sums recovered fully repair the damages suffered, while it is evident that reparation is in fact partial or unequal. Inequality in recovery would necessarily produce discrimination. If, on the other hand, such claims must be submitted in the first instance to the Commission, they will be acted upon uniformly, will be adjusted according to the same rule—a rule that will presumably be adopted after a full and comprehensive view of the whole situation and of all the relevant circumstances—and the damages will be awarded, not arbitrarily or capriciously, but by the application of the same standard. In a word, and without repeating the language of the Supreme Court that seems to me to justify the conclusion, I hold that the Commission has the primary jurisdiction to award reparation for such damages as may have been caused by a preferential practice in distributing coal cars in case of shortage; and that the circuit court has not the primary power to award such damages, even although they may have been caused by a practice that did not prevail at the time when the suit was brought. If the plaintiff's contention is sound it follows that two irreconcilable results may come to pass. If section 9 applies to a situation like this—where the practice complained of has ceased—a shipper who elects to sue at law is thus turning to a tribunal upon which his election may be said to confer exclusive jurisdiction of his complaint. But if another shipper has previously been obliged to go before the Commission—the obnoxious practice being then in force—it is clear that this shipper (who is seeking redress for the same wrong) has addressed the proper tribunal, for in that event it is conceded that the Commission had exclusive primary jurisdiction of the subject-matter. Whose decision

is to prevail? It might easily happen that after one shipper had appealed to the Commission a carrier might give up the practice, either before or after the Commission had passed upon its validity, and that other shippers might thereupon bring suits at law to recover damages, as the present plaintiff has done. If the Commission has no power to entertain the complaints of these shippers because the practice has ceased—and this is the plaintiff's position—the courts must have complete jurisdiction, and must therefore be able to decide whether the practice complained of is preferential. But, as the Commission had undoubted primary jurisdiction of the complaint that was first made, does the ruling of the Commission govern in case the practice should be sustained in whole or in part? Or does the ruling of the court govern, in case the practice should be condemned, either in whole or in part? Under the Illinois Central's Case the decision of the Commission upon such a subject is declared to be final; the wisdom or discretion of the order is not to be reviewed by the courts; and yet a ruling that is thus adjudged to be final would nevertheless be practically subject to review at the hands of a jury or of several juries, and might be wholly set at naught.

If it be asked, What then becomes of the power to sue for damages that is given by section 9 of the act? the answer is apparently to be found in the following language from the Abilene Oil Company Case (page 442 of 204 U. S., page 356 of 27 Sup. Ct. [51 L. Ed. 553]):

"In other words, we think it inevitably follows from the context of the act that the independent right of an individual originally to maintain actions in courts to obtain pecuniary redress for violations of the act, conferred by the ninth section, must be confined to redress of such wrongs as can, consistently with the context of the act, be redressed by courts without previous action by the Commission. * * *"

There are wrongs to which a shipper may be subjected that do not need previous action by the Commission. For example—to give a single illustration—isolated acts of oppression or extortion, directed against individuals, might in all probability be redressed by suit at the election of the injured shipper. But where a practice that is applied alike to all shippers, or to all of a class, is complained of because its effect is nevertheless averred to be preferential, a different situation is presented. There the act has given to the Commission a primary jurisdiction over the subject-matter in order that redress may be intelligent, complete, and uniform; and this I believe to be true whether redress is sought before, or after, the practice has been given up.

The defendant's motion to dismiss the suit for want of jurisdiction must be granted.